19314

Rosa Elizabeth FAULKNER, Individually and as Executrix under the Will of W. M. Faulkner, et al., Appellants, v. W. Meek FAULKNER, Jr., and Hilton Head Agricultural Company, Respondents.

(184 S. E. (2d) 718)

*John A. Marion, Esq.,* of York, *for Appellants,* cites:

*Melvin B. McKeown, Jr., Esq.,* of York, *for Respondents,* cites:

November 9, 1971.

BRAILSFORD, Justice.

In this action by the widow and two daughters of W. M. Faulkner against W. M. Faulkner, Jr., plaintiffs seek a declaration by the court that the defendant holds title to a share of stock in Hilton Head Agricultural Company as trustee. The case was tried by reference, and plaintiffs appeal from an adverse judgment of the circuit court.

Hilton Head Agricultural Company, a North Carolina corporation, was organized in 1917 to acquire and manage

land on Hilton Head Island as a hunting preserve. Membership in an affiliated social and hunting club was limited to stockholders of the company, forty-two in number. W. M. Faulkner purchased a share of stock at the going rate of $250.00 in the early 1930's and became a member of the club. He became physically disabled and unable to participate in club activities in 1942, after which his son, the defendant, enjoyed the privileges of the club as his father's guest. Mr. Faulkner continued to pay the annual assessments against his membership until 1954 when he transferred his share of stock to his son by written assignment, absolute on its face. Thereupon, William, Jr., sometimes referred to in the record as "Bud," became a member of the club.

After Mr. Faulkner's death in 1965, this action was commenced. The complaint alleges that the transfer of the share of stock was in trust for the plaintiffs and the defendant, "the latter to also enjoy the hunting and social privileges of the Club." Specifically, the plaintiffs allege that a duty was imposed by father upon son under the terms of the trust, to wit, if the corporation should sell its Hilton Head property, or the timber thereon, then "the proceeds of such sales would be received by the (trustee) for the benefit of" the three plaintiffs and the defendant, and "divided between the four of them, share and share alike." The primary relief sought is a declaration that the defendant holds the share "in trust for the plaintiffs * * * and himself, share and share alike." The answer of the defendant denies the material allegations of the complaint and claims ownership of the share of stock as transferee of his father.

It is quite apparent that the allegations of the complaint, if supported by the evidence, would raise an express trust—a creature of the settlor's intention manifested at the time of the transfer. However, the referee and the circuit judge have found that there is no evidence that such a trust was created, and plaintiffs do not contest this conclusion. Instead, without amendment of the complaint, they rely upon the doctrine of constructive trust—a creature of equity jurisprudence,

raised without regard to intention to prevent unjust enrichment. Restatement, Restitution, Sec. 160 (1937).

The large tract of land owned by the corporation on Hilton Head Island was of modest value in 1954 when the assignment was made. At that time, a share of stock in the corporation was worth between seven and eight hundred dollars. The transfer of the share to William, Jr., was not conspicuous and did not stand alone. At about the same time Mr. Faulkner, who was an ill man, made a rather general distribution of most of his modest assets among his wife and children.

The genesis of this controversy is the enormous enhancement in land values on Hilton Head Island which followed its connection to the mainland by a bridge in 1956. Aware of the enhancement in progress, Mr. Faulkner, according to his widow's testimony, admonished his son, "Bud, you know that if this land is sold, it is to be divided equally." Bud's reply was "You can't do that, Dad. I have already had it issued in my name." Following this conversation, Mr. Faulkner made a new Will. By item 3 of this 1958 document he undertook to devise the stock to his son "for hunting purposes only," but should the land be sold, the stock would go to his wife and three children in equal shares.

In 1962 a close friend and hunting companion of Mr. Faulkner's sold his share of stock in the corporation for $16,000.00. Mrs. Faulkner was asked whether this sale resulted in a conversation between father and son. She replied, "As I recall, Bud asked if he wanted to sell his stock. He said he didn't want to sell the stock, he wanted to keep it for hunting. He wanted Bud to hunt. Hunting was in my husband's blood and was passed to his son and his son's older son. This was something my husband was very proud of. He could see it going down through the generations as hunting stock."

Enhancement in land values on Hilton Head Island has continued apace. The record indicates that the share of stock in controversy is now worth $100,000.00.

Between 1945 and 1947 the corporation received something of a windfall when the timber on its hunting preserve was sold for $52,000.00. Mr. Faulkner and some of the other stockholders favored a division of this money among the members, but it was finally decided to retain it for the improvement and maintenance of the club's facilities. According to the testimony of Mrs. Faulkner and her daughter, until this decision was reached, whenever the opportunity arose, Mr. Faulkner inquired of his son and of other members of the club, who visited him from time to time, when the money was to be divided, when he would get his share. Mrs. Faulkner testified: "I think I mentioned a while ago, he asked when it was going to be divided. At first they didn't know. Weeks went on, and this is what I heard every time anybody came in. Q. When he asked his son, W. M. Faulkner, Jr., known as Bud, what did his son tell him? A. He finally said it was a non-profit corporation and if the money were divided they would have to pay taxes. They voted to keep it intact to pay assessments, taxes, improvements of the club, best I remember." The daughter testified that inquiries of this tenor were made both before and after the transfer of Mr. Faulkner's share of stock to the defendant.

Plaintiff's theory is that the purpose of the stock transfer was solely to make Bud eligible for membership in the club. In addition to the evidence already referred to, they rely upon the instruction which Mr. Faulkner gave for drafting a Will in 1951 as supporting this inference. Mrs. Faulkner testified: "He was not thinking too clearly, but foremost in his mind was what he was going to do with his hunting equipment and he mentioned that the hunting stock, and he never said 'my stock certificate,' he said 'my hunting stock I want to leave for Bud and Park (a favorite nephew, interpolated) to hunt on.' * * * Q. At that time, he stated he wanted his hunting stock to go to Bud and Park for hunting purposes? A. That's right." Her daughter testified similarly.

The written assignment, absolute on its face, is presumed to be what the words import, the transfer of title and beneficial ownership of the stock to the defendant. The burden was upon plaintiffs to overcome this presumption by clear and convincing testimony. We have undertaken to state the substance of all of the evidence marshaled by them in their effort to sustain this burden. We must agree with the referee and circuit judge that it is manifestly insufficient.

The testimony as to Mr. Faulkner's declarations in the preparation of the 1951 Will has little, if any, tendency to show that he intended for plaintiffs to take a beneficial interest in the stock under that instrument. It bears not at all on his intent in the execution of the assignment three years later.

We must assume that the testimony as to Mr. Faulkner's inquiries about division of the timber proceeds, allegedly before and after the stock assignment, and that as to the 1962 conversation between father and son concerning whether the stock should be sold, was offered as supporting an inference that the father retained the beneficial ownership of the stock after the assignment. The testimony is equivocal at best. It need not be weighed because plaintiffs do not claim the stock under the 1958 Will. Any inference that the beneficial interest in the stock was retained by Mr. Faulkner is opposed to the foundation upon which they base this lawsuit *i.e.*, that upon the assignment a constructive trust arose in their favor.

Neither the testimony as to the conversation between father and son preceding the execution of the 1958 Will nor the provisions of item 3 of the Will have probative value on the intent of the parties to the 1954 assignment. The bridge had then been open for two years, and a new situation had arisen. Mr. Faulkner apparently had come to fear, with reason, that the pre-bridge gift to his son of a lightly regarded asset would eventually unbalance the distribution of his estate. He regretted having made

the absolute assignment and undertook to undo it by his Will. However, he could not bequeath what he no longer owned, and, as already stated, plaintiffs do not claim under the Will. Nor was the Will admissible as evidence of his intention in making the earlier assignment. *All v. Prillaman,* 200 S. C. 279 20 S. E. (2d) 741 (1942).

There is no hint that the defendant induced the transfer of the stock by actual or constructive fraud or wrongdoing of any kind, or even that he suggested it. Nor was any confidential relationship alleged or proved which would justify the inference of undue influence. Mrs. Faulkner testified that it was *she* who urged Mr. Faulkner to require his son to undertake the financial burdens accompanying membership in the club since he was the only family member who utilized his father's hunting privilege. Inferably, it was in response to her suggestion that Mr. Faulkner assigned the stock to his son.

Not all the evidence reviewed above was found admissible by the referee. Since the record presents no grounds for relief in any case, it is unnecessary to consider the propriety of the evidentiary rulings.

Affirmed.

Moss, C. J., and Lewis, Bussey and Littlejohn, JJ., concur.